Sidney Squire, J.
This claim for $24,230 was tried before me in Albany. The case was strenuously litigated for six trial days followed by posttrial and reply briefs.
Initially, claimant pleaded a cause of action for breach of a contract with the defendant, The State of New York, acting through its employees in the Division of Military and Naval Affairs ("DMNA”). Said claim, verified on May 16, 1973, was filed on May 18, 1973 and on that day served on the Attorney-General. Each of these acts was timely.
At different times thereafter, claimant made three separate motions for examinations before trial of the defendant. These motions resulted in orders of the court signed by colleagues of mine on December 11, 1973, January 30, 1974 and July 31, 1974, granting the several motions.
After a lieutenant colonel, a major and an armory superintendent were deposed, claimant moved for an order "permitting the claimant to serve the amended and/or supplemental *703 claim as presented” therewith. The defendant then cross-moved to dismiss the claim because it failed to state a cause of action and for other relief. Said motions resulted in a "Memorandum-Opinion and Order” signed by a colleague on December 16, 1974 granting claimant’s motion and denying all portions of the defendant’s cross motion. There was no appeal from said order or any part thereof.
On December 26, 1974, claimant filed (and on January 3, 1975 served) his "amended and/or supplemental claim” pleading two causes of action. For "a first cause of claim”, the allegations of the initially filed claim were repleaded. The "second cause qf claim” pleaded extensive new matter asserting several bases of estoppel in amplification of the breach of contract "cause of claim”. There was no change in the demand for $24,230.
In February, March and April of 1973 under the jurisdiction of its DMNA, the defendant owned, operated and controlled many armories throughout the State. One of them was located on New Scotland Avenue ("the Armory”) in Albany. Primarily, the armories were for governmental purposes. When not so employed, they had proprietary uses.
Section 183 of the Military Law prescribes essential requisites for the nongovernmental use of an armory. The pertinent provisions thereof are:
"§ 183. Use of armories.
"1. Armories may be used as follows: * * *
"e. (1) By a person, firm, association or corporation, not specified in subdivisions a to d both inclusive of this section, actually using the same, for such purposes and upon such terms as may be approved by the officer in charge and control of the armory and by his military superiors as prescribed by regulations issued pursuant to this chapter and provided that such use will not, and only so long as such use does not interfere with the use of the armory by the members and units of the organized militia stationed therein.
"(2) The person, firm, association or corporation applying for such use of space within an armory shall execute and deliver a written agreement which shall include among its provisions his or its full name and address, the purpose for which such use is desired, the nature and manner of the intended use of such space, the full amount of compensation of any kind or nature whatsoever to be paid as rent for such use, the *704 amounts to be paid for heating, lighting, janitorial and other services connected with such use. The rental terms and other provisions of such agreement shall be governed by regulations issued pursuant to this chapter, which regulations shall include provisions designed to prevent unfair competition with privately owned property and business.
"(3) No such agreement shall be effective and no armory may be so used unless and until such agreement shall have been approved and executed by the officer in charge and control of the armory and shall have been approved by his military superiors as prescribed by regulations issued pursuant to this chapter.”
The section makes references to "regulations issued pursuant to this chapter”. However, it is significant to note that there was no proof before me of the official filing of any such regulation.
The DMNA is a division of our State’s Executive Department (Executive Law, § 31). To make certain that those dealing with the State can know and be bound by pertinent regulations, section 8 of article IV of our State Constitution, and section 102 of the Executive Law require that such regulations be filed in the office of the Department of State.
In this trial record there is no written or oral evidence of the filing of any such DMNA regulation. The "Amended and/ or Supplemental Claim” quotes extensively from pamphlets and regulations, none of which was offered or received in evidence. It appears to have been recognized eventually at bar, that no pertinent regulations were filed pursuant to the cited portions of our Constitution or the Executive Law and that therefore such "regulations” were for the "internal management” of the DMNA and not binding on any outsider such as claimant.
In February, 1973, claimant was a young man with a musical background, living in Gloversville. He wanted to stage a rock music concert at the Armory. It was his first endeavor as a producer or promotor and regrettably, his first real encounter with the DMNA.
Claimant telephoned the armory’s superintendent ("Supt.”) who gave information and said he would call back. The Supt. phoned the DMNA Facilities Office. The person in charge of that office, the Facilities Operations Officer, was a Lieutenant Colonel ("Lt. Col.”) who usually acted through a particular "civilian” employee. That alter ego instructed the Supt. as to *705 the commercial rental for the rock concert and to make certain that there was sufficient security, i. e., adequate policing. There was a third participant in this conversation, the State Quartermaster who also spoke about proper security and told the Supt. to obtain the names of the performing groups.
The Supt. then phoned claimant, stated that a security force of 50 men would be required and informed him as to details needed in a letter to be sent to the Supt; The claimant sent a letter dated February 16, 1973 requesting the armory rental for "a rock or rock-jazz type concert” admitting the public on Friday, April 6, at 8:00 p.m. and closing at 2:00 a.m. on Saturday, April 7. The letter also gave the name of "the headliner”, seating arrangements, the "expected number” of those attending as "between 2,000 and 2,500” and that the "ticket price will be $3.75 per person”. Thereupon, claimant spoke with the entertainment agent for the performers and was told that Sunday, April 8, was a better date than the suggested Friday, April 6. Claimant agreed and then informed the Supt. thereof.
When the Supt. received claimant’s letter, he prepared a DMNA form 99 which requested approval to execute an armory use agreement for claimant’s project. The copy of claimant’s letter accompanied the form 99 in one envelope.
The DMNA admits that it has claimant’s letter but maintains that it does not have that form 99. I do not believe that the form 99 was lost, as asserted by the defense. The proof throughout this trial demonstrates deplorable inefficiencies on the part of DMNA with respect to its routine office procedures relating to commercial matters.
On Tuesday, February 20, 1973 (the 19th having been observed as Washington’s Birthday), the Supt. prepared the "agreement for use of armory” which is DMNA form 18. The agreement which remained dated the 20th, was signed on the 22nd by the Lt. Col. who was the officer in charge and control of the armory. It was mailed to Mr. Zayciek who received it on Friday, the 23rd.
The agreement provided for claimant’s rental on Sunday, April 8, 1973 from 4:00 p.m. to midnight. In paragraph 4 of the exhibit there were set forth seriatim that claimant agreed to pay to the defendant $810, composed of $200 for rent, $90 for service charge, $20 for public liability insurance, $400 for "janitorial and security” and $100 for a bond. There were more financial details typewritten at the end of page 4 of the *706 exhibit. Claimant was also to pay "in advance by certified checks”: $32.50 for a "cleaning lady for ladies room”, $100 for "rubbish removal”, $187.50 for "5 parking attendants”, and $180 "to control traffic” (at the rate of $60 for each of "3 Albany Policeman”). The final one of the "Conditions” provided that: "5. there will be 50 additional SECURiTYmen required to adequately secure the Armory and the surrounding buildings. These men will consist of Albany County Sheriff personnel, The State Campus Police and the full time personnel who work in the Armory. The fee will be $5.00 per hour per man”
The agreement was signed by the Lt. Col. who was the "Officer in Charge and Control of the Armory”. Paragraph 5 of the agreement declares: "5. This agreement shall not be effective and said Armory shall not be used unless and until this agreement shall have been approved and executed by the Officer in Charge & Control of said Armory and shall have been approved by his military superiors as prescribed by regulations issued pursuant to the Military Law of the State of New York.”
This language is practically the same as the above-quoted section 183 (subd 1, par e, cl [3]) of the Military Law. In substance, they are the same. The only requirement for a signature is that the agreement must be "executed by the officer in charge and control of the armory”. Exhibit 4 (the agreement) does bear the signature of that officer. The signature denotes his approval.
"The general presumption is that no official or person acting under an oath of office will do anything contrary to his official duty, or omit anything which his official duty requires to be done.” (Matter of Marcellus, 165 NY 70, 77, quoted in Richardson, Evidence [10th ed, 1973], p 49, immediately under the heading, "§ 72. Presumption as to Regularity.”) In our case there was no credible "affirmative evidence of unlawful or irregular conduct” on the part of said Lt. Col. (op. cit., supra).
It is my determination that the second requirement of the agreement’s paragraph 5, i. e., "shall have been approved by his military superiors as prescribed by regulations”, need not be in writing. It would have been a simple matter for the agreement to provide for written approval. The agreement was a printed "DMNA Form 18” prepared by DMNA. It is axiomatic that a contract is construed most strongly against the party who prepared it. (Matter of Goldfield Corp. v Gen *707 eral Host Corp., 29 NY2d 264, 272 [Breitel, J.]; Evelyn Bldg. Corp. v City of New York, 257 NY 501, 513; 10 NY Jur, Contracts, § 223.)
Moreover, the DMNA could have given notice that a written approval was required, by filing in the Department of State an appropriate regulation in compliance with the afore-cited provisions of our State Constitution and Executive Law.
Before the Exhibit 4 agreement was signed by the Lt. Col., initial approval for the Zayciek project had been obtained orally by the Supt. from the State Quartermaster, an official who was superior to the Lt. Col., and from the alter ego of the Facilities Operations Officer, also a Lt. Col. who supervised the Officer in Charge and Control of the Armory. Subsequent events continued and confirmed the approvals.
To effectuate this armory rental, the Supt. began to make arrangements for the hiring of the required security personnel. He telephoned the Albany County Sheriff’s office and was referred to the Chief of the Capitol Buildings Police. The chief said that he wanted the request to be made by the DMNA Chief of Staff (who was a Major General). The Police Chief immediately telephoned the Major General. The latter was on vacation and so the chief spoke with the Acting Chief of Staff, a Brigadier General ("Brig. Gen.”).
When the Supt. phoned the Brig. Gen., the latter stated that he had already spoken with the Police Chief. The Brig. Gen. discussed the situation with the Supt. and said that another officer would confer with the Supt.
At the direction of the Brig. Gen., the Colonel who was the DMNA Director of Logistics, assigned to that task a Captain who was the DMNA Armory Management Supervisor. The Captain went to the Armory on March 1 and conferred with the Supt. The latter was told that the amount of security needed was the function of the Supt. but the hiring of such personnel was to be done by the lessee.
On the following day, Friday, March 2, the Captain prepared a written report which he delivered that day to the Colonel who was Director of Logistics. The Colonel took the report in to the Brig. Gen. who was Acting Chief of Staff (while the Chief of Staff was on vacation from February 23 until March 12, 1973). The Colonel and Brig. Gen. conferred about claimant’s application and that report.
Thereupon, on that March 2, the Captain phoned the Supt., *708 saying "we will approve” and "go ahead with the 50 men”. The Supt. phoned Mr. Zayciek that the 50 men were approved but that they were to be hired by claimant, not the Supt. Mr. Zayciek was also told to send another letter for the armory rental because his first letter had been "scratched up” by the Captain and did not contain the agreed-upon April 8 date. That April 8 date was in the Exhibit 4 agreement.
On Monday, March 5, claimant sent the requested letter bearing that date. He continued and concluded the procurement of security men and then so informed the Supt. Thereupon, the latter verified that fact with the Sheriff’s office. The young impresario had tickets printed and distributed for sale at strategic places, arranged for radio and newspaper advertisements, had posters placed and flyers circulated. There remained for him to deliver his signed agreement to the DMNA, which he was told he "could bring in a few days before the concert”.
On Monday, March 26, claimant withdrew $3,025 from his savings account No. 61733 with the Fulton County National Bank and Trust Company in Gloversville. That represented one half of the total compensation promised to the headline act and to the warmup group. The 50% to each was nonreimbursable. Thus, $2,750 was paid to the headliner and $275 to the other group.
Meanwhile, "back at the” DMNA, events were occurring of which claimant had no knowledge. At no time had claimant been told that no rock concert would be permitted at the armory. Nevertheless, throughout the tapestry of the defendant’s case, a proscriptive thread was being woven. As to this facet, the Major General who testified before me, made a very poor impression. Epaulettes, high rank, power and arrogance do not excuse an inexplicably poor memory or a cover-up. At best, one could say that this witness was confused by a ukase apparently relating only to another armory, the one at Washington Avenue where there had been an incident in 1970, about three years before the Zayciek application.
As the trier of the facts who listened to and observed each of the witnesses and weighed all of the testimony and exhibits in evidence, it is my determination that at no time before the Zayciek transaction was there a DMNA official regulation preventing a rock concert at the armory on New Scotland Avenue. Such alleged prohibition was an afterthought, unfairly concocted to undo claimant’s approved enterprise.
*709 It must be remembered that for the many weeks while (a) the Supt. was speaking with claimant, the matter received the attention also of (b) the Lt. Col. who was the Officer in Charge and Control of the Armory, (c) the Facilities Operations Officer (another Lt. Col.) through his alter ego, (d) the State Quartermaster, (e) the Brig. Gen. who was Acting Chief of Staff, (f) the Colonel who was the DMNA Director of Logistics, and (g) the Captain who was the DMNA Armory Management Supervisor. No one said that there was a policy prohibiting Zayciek’s rock concert at the armory. Were there such a proscription in fact, it would have been simple for one of these seven State employees to have scotched the endeavor immediately.
The Chief of Staff had returned to duty on Monday, March 12 and was "briefed” re claimant’s application, by the Brig. Gen. who had been Acting Chief of Staff. Nothing was done for about a week or 10 days. Somehow, on or about March 22, no one could find the form 99. So, on the 22nd that alter ego of the Lt. Col. phoned the Supt. to send up "another” form 99. It was prepared on the 22nd by the Supt. who had it signed by the Officer in Charge and Control of the Armory at the latter’s civilian place of employment and then taken by the Supt. to the campus office of the alter ego where it was hand delivered.
Again the situation languished until the 29th. On that day, it was reviewed by the two highest-ranking officers of DMNA with another Brig. Gen. and the Colonel-Director of logistics. The Chief of Staff, allegedly on recommendation of the other three officers at that meeting, disapproved claimant’s application. It is my determination that it was the Chief of Staff who wanted the disapproval.
Even then, although the "1st Ind” (endorsement) on the 29th specifically "requested that Mr. Zayciek be informed of the decision of this Division as soon as possible”, it was not until about 4 p.m. of the next day, the 30th, that the Supt. was notified thereof and directed to inform claimant. There followed the calamitous phone call to claimant at about 4:20 p.m. that Friday.
It seems strange that throughout all these maneuvers, the DMNA failed to realize that there was a commercial transaction involved with a fixed performance date. The DMNA officers and personnel handled 400 to 500 rental requests annually. They were familiar with the normal incidents thereof including expenses incurred. Indeed, "where a hall is *710 let for the purpose of an 'entertainment’ * * * it must be assumed that the printing and mailing of tickets * * * and circulars * * * were within the contemplation of the parties”. (Beth David Hosp. v Terrace Garden, 175 NYS 498, 499 [Guy, J.].)
Of all of the DMNA employees who testified before me, the most truthful one was the Armory Supt. This was a frightened "civilian” employee who strove mightily to tell the truth despite the presence in the courtroom of "brass” upon "brass” upon "brass” who could practically annihilate his job and impair his future livelihood. His testimony was not flawless but his sincerity and veracity were manifest.
Claimant, a young idealist, never anticipated that in 1973 in the capital city of the great Empire State, he could be treated so shabbily by those in power. Had there been an earlier retention of the lawyer who tried the case for him perhaps the cancellation would not have occurred and his proof of damages would have been better than it was. Claimant is a truthful young man who relied on the elders with whom he was dealing. Mr. Zayciek exhibited a high regard for principles of fairness and decency, bulwarks of justice. It is regrettable that these principles were emasculated by defendant’s employees of senior ranks.
On the trial record before me, it is my conclusion that by a fair preponderance of the credible evidence, the claimant sustained his burden of proof as to liability.
Claimant’s proof of damages was not of the same quality. He did prove his payments and the nonreturn of the $3,025, i. e., the $2,750 and $275 partial payments for the headliner and warmup group hired for the April 8 concert. I find as other elements of damages: $54 for radio time, $30 for newspaper advertising, and $158.59 for long distance telephone charges, culled from the Exhibit 24 bills. These items of damage resulting from the defendant’s breach of contract, total $3,267.59.
The remaining attempted proof as to posters and flyers, printing, traveling and other claimed expenditures, do not have supportive evidence of a substantial nature sufficient to be cast as damages. Unfortunately, the inexperienced claimant did not have adequate business records.
Our adjudicated cases contain many appellate expressions as to the difficulty in proving loss of profits. The claim at bar is also demonstrative thereof. Here, such attempted "evi *711 dence” was imprecise and speculative, falling short of the mark. No award is being made for this element of damages.
The defendant’s motions to strike oral and written evidence (on which decisions had been reserved), are now denied. The attacked proof remains in the trial record for the limited purpose of credibility and not as evidence in chief.
The motions of defendant to dismiss made at the close of claimant’s prima facie proof and at the end of the trial (on which decisions had been reserved), are now denied.
The parties in open court having waived the submission of proposed decisions, the clerk of this court is directed to enter judgment herein in favor of the claimant, John D. Zayciek, against the defendant, the State of New York, for $3,267.59 with interest thereon from March 30, 1973 to the date of entry of judgment herein.